James TURNER, Plaintiff-Appellant and Cross-Appellee,

v.

JAPAN LINES, LTD., and Philippine President Lines, Inc., Manila, Defendants-Appellees and Cross-Appellants.

Nos. 79–4060, 79–4062 and 79–4182.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 11, 1980.

Decided July 27, 1981.

Raymond J. Conboy, Pozzi, Wilson, Atchison, Kahn & O'Leary, Portland, Or., for Turner.

Paul N. Daigle, Souther, Spaulding, Kinsey, Williamson & Schwabe, John R. Brooke, Wood, Tatum, Mosser, Brooke & Holden, Portland, Or., Ridgway K. Foley, Jr., Portland, Or., for Japan Lines, Ltd.

Before FLETCHER and FERGUSON, Circuit Judges, and GRANT, District Judge.*

FLETCHER, Circuit Judge:

These are appeals and cross-appeals from a judgment n. o. v. for defendants Japan Lines and Philippine President Lines, following a jury trial in which plaintiff-appellant Turner received a verdict for $955,-976.11. Turner appeals from the grant of judgment n. o. v.; Japan Lines and Philippine President Lines cross-appeal to attack the jury verdict, if it should be reinstated.

I

FACTS

Turner was a longshoreman in Longview, Washington. On June 13, 1974, he was unloading plywood from the PRESIDENT QUEZON when a stack of plywood in the hold collapsed beneath him. Turner in-

curred serious injuries, and as a result now suffers from an apparently untreatable form of epilepsy.

The vessel PRESIDENT QUEZON is owned by Philippine President Lines (Owner). At the time of Turner's accident, the vessel was time-chartered to Japan Lines, Ltd. (Time-Charterer) under the New York Produce Exchange charter party. The cargo of plywood was loaded on the PRESIDENT QUEZON in Kushiro, Japan by Mitsuwa Transport Co., a stevedore, pursuant to a contract with the Time-Charterer. Another Japanese firm was engaged to shore and lash the cargo, and the completed stow was inspected by a licensed Japanese marine surveyor.

At trial, Turner produced evidence to show how stacks of plywood should be stowed in the hold of a ship and how the plywood on which he was injured was improperly stowed. According to the testimony, the hull of the vessel curves outward and upward from the deck of the lower hold. This concave curvature is called the "sheer" of the ship. When bundles of plywood are stowed against the sheer, the first stack of bundles (three or four feet thick) is butted against the sweat battens, which protect the cargo from contact with the bare hull. Dunnage (lengths of scrap lumber) is placed on top of the stack to separate it from the stack above, so that when the cargo is unloaded, the forks of lift trucks can be fitted between them. The next stack of plywood is placed atop the dunnage and butted against the sheer. This stack rests only partially on the first stack; part of it is unsupported from below because of the outward curve of the sheer. In order to prevent the stack from tipping under the weight of workers or of the stacks on top of it, it must be "shored" from below. The shoring consists of vertical lengths of lumber nailed upright between the dunnage timbers and the sweat battens

of the hull. The shoring, or lack of it, is invisible to the offloading longshoreman until the plywood it supports is removed.

The evidence showed that no nails were found in the pile of lumber under the collapsed plywood after the accident. Expert testimony indicated that it should be inferred from this that the shoring had not been constructed properly. There was also evidence that a properly shored stack of plywood should not have collapsed under the weight of a longshoreman.

Witnesses testified that many hours of work by marine carpenters would have been required to build proper shoring. The vessel's log indicates the time at which the marine carpenters who constructed the shoring entered the hold. This, according to plaintiff, indicates that the master or one of the mates was aware that the shoring work had begun, and had ample opportunity to monitor it.

Plaintiff also called expert witnesses who testified as to the duties of the master of the ship in overseeing the stow of the cargo. The experts testified that the master's primary duty is to protect the seaworthiness of the vessel and the safety of the crew and passengers. The master is also responsible for the safety of the cargo and those who unload it. The master or one of his mates is always on watch on the vessel. The experts also testified that the master or one of his mates is responsible for overseeing the loading operations and particularly for ensuring that the cargo is properly shored.

The evidence showed that Turner was injured when he was standing atop three stacks of plywood, nine to twelve feet above the deck of the hold. He was in the process of rigging the ship's hoisting gear to the top stack of plywood when the stack tipped beneath him. The falling stack knocked the stacks underneath it away from the sheer of the hull, and the entire stack collapsed. Turner was struck on the head.

This testimony was uncontradicted by defendants, who submitted only documentary evidence. The magistrate instructed the jury that the Owner or the Time-Charterer or both would be liable to the plaintiff if the master of the vessel knew or in the exercise of reasonable care should have known of the defective stow and of the danger it posed. The magistrate also submitted to the jury the question whether, if the master of the vessel was found to have been negligent, he was acting for the Owner or the Time-Charterer or both. The jury returned its verdict for plaintiff against both defendants.

After the jury returned its verdict, the magistrate granted judgment n. o. v. to the defendants on the authority of *Ruffino v. Scindia Steam Navigation Co.*, 559 F.2d 861 (2d Cir. 1977). It is unclear from the order granting judgment whether the magistrate considered the evidence insufficient to go to the jury on the question of negligence, or whether he concluded that defendants had no duty to plaintiff as a matter of law.

The questions presented for our review are:

(1) whether the defendant(s) owed any duty to the plaintiff under the circumstances of this case;

(2) if so, whether the evidence was sufficient to support the jury's verdict;

(3) if so, whether under the charter party, the Owner or the Time-Charterer or both are liable to plaintiff for his injuries.

## II

## NEGLIGENCE

### A. Vessel's Duty to Longshoremen

This case arises under § 5(b) of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b) (1976). That section, as amended in 1972, gives an injured longshoreman a cause of action against a "vessel" for its negligence. "Vessel" is defined to include the vessel's "owner, owner pro hac vice, agent, opera-

tor, charter [sic] or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21). However, since the 1972 amendments the longshoreman no longer has an action against the vessel for unseaworthiness, a type of liability without fault. *Compare Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), *with Scindia Steam Navigation Co. v. de los Santos*, —— U.S. ——, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).[1]

The Supreme Court has recently held that negligence under § 905(b) is to be measured by the general maritime standard of reasonable care under the circumstances, and that

> [t]his duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with *reasonable safety to persons and property*, and to warning the stevedore of any hazards on the ship or with respect to *its* equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations *and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.*

*Scindia Steam Navigation Co. v. de los Santos*, 101 S.Ct. at 1621. *Scindia* involved a longshoreman who was injured by an allegedly defective winch during offloading operations. The shipowner there contended that it had no duty to repair the ship's equipment once the ·stevedore had commenced work. The Court rejected this contention, holding that if the shipowner was or should have been aware of the winch's condition and of the unreasonable risk of harm to the longshoreman, and if it were clear that the stevedore would not or could not remedy the problem, the shipowner would have a duty to intervene. *Id.*

The defendants here argue that neither the Owner nor the Time-Charterer had any duty to supervise the activities of the loading stevedore, so that neither can be held liable to an offloading longshoreman for injuries which result from the loading stevedore's negligence. We have found one decision apparently adopting this view. *Ruffino v. Scindia Steam Navigation Co.*, 559 F.2d 861 (2d Cir. 1977).

There are, to be sure, other cases in which courts have rejected attempts by longshoremen to recover from a vessel for failure to supervise the work of the stevedore. With the exception of *Ruffino*, however, those cases involve injuries incurred during stevedoring operations and allegedly caused by the injured *employee's* stevedore-*employer's* negligence. In this context, the Supreme Court in *Scindia* and the circuits in numerous cases have reviewed the reasons why, under the amended Act, it would be undesirable to impose liability on the shipowner for failing to supervise minutely the stevedore-employer's operations. *See, e. g., Scindia Steam Navigation Co. v. de los Santos*, —— U.S. ——, 101 S.Ct. 1614, 1622–24, 68 L.Ed.2d 1 (1981); *Munoz v. Flota Merchante Grancolombiana, S. A.*, 553 F.2d 837, 840–41 (2d Cir. 1977). The shipowner, after the 1972 amendments, no longer has a right over against the stevedore-employer for its concurrent negligence. 33 U.S.C. § 905(b);

---

1. Considerable controversy has arisen over what constitutes "negligence" as opposed to "unseaworthiness." Some commentators have suggested that the difference between the two causes of action is slight, since most unseaworthy conditions are the result of someone's negligence. *See e. g.*, G. Gilmore & C. Black, *The Law of Admiralty* 452–55 (2d ed. 1975). The two situations in which an injured longshoreman can no longer recover from the vessel would seem to be (1) where the injury is the result of a condition of which the vessel has no notice or opportunity to correct, and (2) where the injury is caused entirely by the negligence of a third party, *e. g.*, the longshoreman's stevedore-employer. *Id.* at 452. This interpretation comports well with the purposes of the 1972 amendments. *See* H.R.Rep. No. 92–1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 4698, 4699, 4703–05.

*Scindia Steam Navigation Co. v. de los Santos*, 101 S.Ct. at 1624; *Munoz v. Flota Merchante Grancolombiana, S. A.*, 553 F.2d at 841. However, if the longshoreman recovers from the vessel in a negligence action, the stevedore-employer can then recover from the longshoreman the value of the compensation payments made to him. 33 U.S.C. § 933. Thus, the stevedore-employer would be effectively relieved of any liability, even if it were primarily at fault. This result would remove any incentive to the stevedore to improve the safety of its operations, thus vitiating one of Congress' goals in enacting the amendments. *Scindia Steam Navigation Co. v. de los Santos*, 101 S.Ct. at 1629 (Powell, J., concurring); *Munoz v. Flota Merchante Grancolombiana, S. A.*, 553 F.2d at 841.

This concern may be justified, but it has no relevance to the case before us. The third party that is primarily negligent is not the plaintiff's employer, but rather the Japanese stevedore (the negligence of the vessel is premised on failure of the master to exercise reasonable care in supervision of the work of the Japanese stevedore). Section 905(b) does not bar the shipowner from recovering against the foreign stevedore, only from recovering against the "employer" as defined in the Act. 33 U.S.C. § 902(4). Second, the fact that the plaintiff's stevedore-employer will be able to recover the compensation payments it has made does not in any way diminish its incentive to maintain safe operations. The posited negligence here is that of the foreign stevedore; the parties agree that the stevedore-employer could not have prevented this accident by any exercise of care.

■ To the contrary, imposing a duty on the Owner or Time-Charterer or both in this case should further the congressional goal of safety. The foreign stevedore, who is presumably primarily at fault, may in many cases be beyond reach of the court's processes, and the injured longshoreman would be unable to sue it. As between the vessel and the stevedore-employer, the vessel is the only one in a position to ensure the safety of the longshoremen. The offloading stevedore has no control whatsoever over the foreign stevedore. The vessel, on the other hand, can ensure safety by choosing a reliable foreign stevedore, supervising its work when necessary, and warning the offloading stevedore of concealed dangerous conditions created by the foreign stevedore. We do not believe that Congress, in enacting a careful scheme of compensation and liability, could have meant to leave the longshoreman to the mercies of foreign stevedores against which he may have no rights or, at least, no practical remedy. We hold, therefore, that the vessel had a duty to protect the plaintiff against concealed dangers created by a foreign stevedore which the vessel could, in the exercise of reasonable care, have corrected or warned of.[2]

### B. Sufficiency of the Evidence

■ The next question we must consider is whether the plaintiff presented sufficient evidence from which the jury could have concluded that the vessel knew or should have known of the lack of shoring in the hold, and of the resulting danger. We think that sufficient evidence was presented.

This court will not disturb a jury's verdict "unless we find that the evidence was insufficient as a matter of law to support [the] verdict—that the evidence was such that no reasonable man would accept it as adequate to establish the existence of each fact essential to liability." *Kunz v. Utah Power & Light Co.*, 526 F.2d 500, 504 (9th Cir. 1975). *See also California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 734 (9th Cir. 1979).

As noted above, the plaintiff presented experts who testified as to the custom in

---

**2.** To the extent that this holding is inconsistent with the result reached in *Ruffino v. Scindia Steam Navigation Co.*, 559 F.2d 861 (2d Cir. 1977), we must, for the reasons given above, disagree with the Second Circuit.

the industry with respect to the master's, and hence the vessel's, responsibility. Defendants argue that this testimony was irrelevant and entitled to no weight at all, because the experts spoke in terms of the master's duty to ensure the "seaworthiness" of the vessel, a concept supposedly irrelevant under § 905(b). This argument, however, misses the point. The experts testified not about legal conclusions ("unseaworthiness" or "negligence") but about custom in the industry with respect to the master's duties. Furthermore, the master *is* responsible for the seaworthiness of the vessel; he is simply not liable without fault to injured longshoremen. *See, e. g., Nichimen Co. v. M. V. Farland*, 462 F.2d 319, 331–32 (2d Cir. 1972). Since the jury was quite properly not instructed in terms of strict liability for unseaworthiness, there is no possibility that it might have confused the two related meanings of the term.

The Supreme Court in *Scindia* observed that a "necessary inquiry is whether the pertinent statutes, regulations, *or custom* place or assume a continuing duty on the vessel." 101 S.Ct. at 1626 (emphasis added). We believe that the expert testimony offered by plaintiff was relevant, and perhaps necessary, to establish the customary scope of the master's duties.

In addition to this expert testimony, plaintiff offered the testimony of longshoremen as to how the cargo should have been shored and how long the shoring should have taken; entries into the ship's log noting when the marine carpenter entered the hold; and testimony that the master or his mates were responsible for continuous supervision of the loading operations,

particularly the shoring of the cargo.[3] Plaintiff also produced evidence that the stow of the cargo was unreasonably dangerous to the offloading longshoremen, and that the defect could not have been discovered by them.

We hold that the evidence taken together was sufficient to support the jury's verdict for plaintiff, and that the magistrate erred in giving judgment n. o. v. to defendants.

## III

### INDEMNITY

Having decided that the "vessel" negligently caused plaintiff's injuries, we must determine whether the liability falls on the Owner, the Time-Charterer, or both. The magistrate asked the jury to decide whether, under Clause 8 of the charter party,[4] the master was acting for the Owner or the Time-Charterer when he failed properly to supervise the cargo operations. The jury responded by holding both defendants liable.

We think that the trial court misperceived the question, and that it was error to ask the jury to interpret the contract. First, the contract was not relevant to the *duty* owed by either defendant to the plaintiff. *Cf. Scindia Steam Navigation Co. v. de los Santos*, 101 S.Ct. at 1626 (contract between vessel and stevedore relevant to vessel's responsibility for safety of stevedore's employees). The question was put to the jury, and the jury decided, that the *vessel* was negligent in either its supervision of the loading operations or its failure to warn plaintiff of a dangerous condition, or both. The vessel discharged its duties through the master, who was an agent of

---

**3.** The plaintiff also argues that he is entitled to the benefit of an inference against defendants because they failed to produce the testimony of Captain Pucan, the master of the vessel. Defendants had apparently notified plaintiff of their intent to produce Captain Pucan, and in fact he was present at the trial. Defendants put on no evidence at trial and neither plaintiff nor defendants called Captain Pucan. We need not address this argument because we hold that the plaintiff's evidence was sufficient to support the verdict without this inference.

**4.** Clause 8 of the charter party provides:

That the Captain shall prosecute his voyages with the utmost dispatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow and trim and discharge the cargo at their expense and risk under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

both the Owner and the Time-Charterer under the charter party. Thus, inasmuch as the jury decided that the loading operations were negligently supervised, it was correct to hold both the Owner and the Time-Charterer liable. It was not up to plaintiff to prove, as between the defendants, which party had contracted to bear the responsibility for loading and unloading operations.

Second, the interpretation of the contract in this context was a question of law and should have been decided by the court. *See, e. g., Migut v. Hyman-Michaels Co.,* 571 F.2d 352 (6th Cir. 1978); *Fernandez v. Chios Shipping Co.,* 542 F.2d 145, 151–53 (2d Cir. 1976). Since the trial court has not considered the question, this court is entitled to do so in the first instance. *See East Oakland-Fruitvale Planning Council v. Rumsfeld,* 471 F.2d 524, 529 (9th Cir. 1972).

The issue before us is whether Clause 8 of the charter party entered into by the defendants places the responsibility for injuries to longshoremen caused by the negligent supervision of cargo operations on the Owner or on the Time-Charterer. The charter party in question, the New York Produce Exchange form, is widely used and has been construed frequently by the courts. *See, e. g., Fernandez v. Chios Shipping Co.,* 542 F.2d 145 (2d Cir. 1976); *Nichimen Co. v. M. V. Farland,* 462 F.2d 319, 330–34 (2d Cir. 1972). *See generally* G. Gilmore & C. Black, *The Law of Admiralty* 229–39, 1003–10 (2d ed. 1975); M. Wilford, T. Coghlin, & N. Healy, *Time Charters* 137–42 (1978). The Second Circuit in *Fernandez* faced the identical issue. It held that Clause 8 of the charter party, which makes the time-charterer responsible for the "load, stow, trim and discharge" of the cargo, *see*

note 4 *supra,* also makes the time-charterer primarily liable for any injury to cargo or longshoremen which results from the improper performance of those operations. *Id.* at 151–53.

We agree with the decision of the Second Circuit.[5] Because plaintiff's injury was caused by improper loading of the cargo, we hold that the Time-Charterer must indemnify the Owner for any damages paid to plaintiff.

REVERSED and REMANDED for proceedings consistent with this opinion.

---

5. Defendant Time-Charterer argues that the Fifth Circuit reached a contrary conclusion in *D/S Ove Skou v. Hebert,* 365 F.2d 341, 351–52 (1966). That case was decided prior to the 1972 amendments to the LHWCA. The court denied the owner indemnity from the time-charterer for damages owed to an injured longshoreman, under Clause 8 of the charter party. *See id.* at 344 n. 5. The court held that the time-charterer made no warranties to the owner that the stevedores hired by the time-charterer would perform in a workmanlike manner. The jury had found that the owner negligently

maintained its ship in a defective condition, and that the stevedore negligently failed to discover the condition and correct it. In contrast, in the case at bar the negligence found by the jury occurred in the course of precisely those operations for which the time-charterer had assumed contractual responsibility. The defect was not one in the ship's equipment, as it was in *Hebert.* Had it been, we would certainly reach a different result, since the Owner expressly warranted in the charter party that it would maintain the ship in a seaworthy condition.