Quentin HEDRICK, Plaintiff,

v.

PINE OAK SHIPPING, S. A., Defendant.

Civ. No. 78–680PA.

United States District Court,
D. Oregon.

Nov. 17, 1981.

Frank H. Pozzi, Raymond J. Conboy, Pozzi, Wilson, Atchison, Kahn & O'Leary, Portland, Or., for plaintiff.

Paul N. Wonacott, Wood, Tatum, Mosser, Brooke & Holden, Portland, Or., for defendant Pine Oak Shipping, S. A.

## OPINION AND ORDER

PANNER, District Judge:

This is an action for damages resulting from injuries suffered by plaintiff while employed as a longshoreman aboard defendant's vessel. The jury returned a verdict in favor of the plaintiff and established special damages of $71,394.40 and general damages of $900,000. Defendant contends there was insufficient evidence of shipowner negligence and has moved for judgment notwithstanding the verdict pursuant to Federal Rule of Civil Procedure 50(b). The motion is allowed.

## APPLICABLE STANDARD

█ In considering the motion I do not weigh the credibility of the witnesses. The evidence and its inferences must be considered as a whole and viewed in the light most favorable to plaintiff. *Davison v. Pacific Inland Nav. Co., Inc.*, 569 F.2d 507, 509 (9th Cir. 1978).

## ADMISSIONS OF THE PARTIES

The parties agree that plaintiff was injured when a splice in the eye of the vang pendant failed, causing the ship's boom and gear to swing and strike plaintiff. He had just commenced work on the vessel M/V CRESSIDA. The winch operator for the longshore gang tested the boom by swinging it back and forth and up and down to make sure that everything was operational. He looked at the wires and checked to see if they were frayed or had jaggers or broken parts of the wire protruding out. He was in the process of lowering the boom to rest it on the forepeak rail so that the other longshoremen could give a visual inspection of the gear at the top of the boom. Without warning the splice gave way causing the boom to swing and injure the plaintiff.

It was agreed that the splice was defective and that it was covered by serving marline (rope wrapping).

Plaintiff contends defendant was negligent in failing to inspect the pendant for a defective splice, failing to warn, using the pendant with a defective splice and in splicing against the lay of the line. Defendant denies plaintiff's charges of negligence.

During the argument on defendants' motion for judgment notwithstanding the verdict, parties agreed that essentially there were two issues:

1. Whether any duty existed on the part of the defendant to remove serving marline from the splice which would have revealed the defect?

2. If the defendant had no duty to remove the serving marline, would a reasonable inspection have revealed the defect in the splice while the marline was in place?

## APPLICABLE LAW

Section 5(b) of the Longshoremen's and Harbor Workers' Compensation Act (Act), as amended in 1972 which is set forth in 33 U.S.C. Section 905(b) provides in relevant part as follows

In the event of injury to a person covered under this chapter caused by the

negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

Before 1972 injured longshoremen could receive compensation payments and also have judgment against the shipowner based on either the ship's unseaworthiness or negligence. *Seas Shipping Co. v. Sieracai*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Proof of unseaworthiness did not require proof of fault on the part of the shipowner. All that was required was an unsafe, injury-causing condition. This was true even though the condition was caused by the stevedore or its employees.

The 1972 amendment radically changed this scheme. Compensation payments from the stevedore for injuries were increased and the longshoremen's right to recover for unseaworthiness was abolished. A remedy for negligence was preserved in Section 905(b) which provided a statutory negligence action against the ship.

Since the amendment in 1972, the Supreme Court has held that a vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in the areas or from equipment under the active control of the vessel during the stevedore operation. *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). In *Santos*, the court also held that the vessel had no duty to the longshoremen to inspect or supervise the stevedoring operations and that Congress intended to make the vessel answerable for its own negligence and to terminate its automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore. The court made it clear that the shipowner has no continuing duty to take reasonable steps to discover and correct dangerous conditions that develop during the loading or unloading process.

*Santos* gives us further guidance at page 1627 with respect to a "notice" type case:

... neither the trial nor appellate courts need deal with them [i.e., breaches of duty] *unless there is sufficient evidence to submit to the jury either that the shipowner was aware of sufficient facts to conclude that the winch was not in proper order or that the winch was defective when cargo operations began and that Scindia was chargeable with knowledge of its condition.* [Emphasis added.]

The analysis therefore becomes quite limited. Here, it is clear that the shipowner was not aware of sufficient facts to conclude that the splice was defective. It is also clear that the splice was defective when cargo operations began. It is therefore necessary to analyze whether there is evidence from which the jury could conclude that the shipowner was chargeable with knowledge of the defective splice.

With respect to the notice question, an analysis of notice cases is helpful. In *Rice v. Atlantic Gulf & Pacific Co.*, 484 F.2d 1318, 1320 (2d Cir. 1973), the Second Circuit affirmed the trial court's order granting the dredge owner's motion for judgment notwithstanding the verdict where the negligence claim arose from grease or an oily substance on a stairway. The court noted that there was no testimony that any agent of the defendant had actually seen an accumulation of oil or grease and there was no circumstantial evidence from which such observation might have been inferred.

*Filipek v. Moore-McCormack Lines*, 258 F.2d 734, 737 (2d Cir. 1958), *cert. denied*, 359 U.S. 927, 79 S.Ct. 605, 3 L.Ed.2d 629 (1959) involved an injury resulting from the snap-

ping of a ship's kingpost under strain. The District Court entered judgment for the shipowner notwithstanding the verdict for the plaintiff and the Second Circuit affirmed. There was evidence that former seamen had heard a cracking sound in the kingpost about two months earlier. After the accident two workers noticed dark spots on the area which might have been rust. There was no evidence that this rust was visible before the accident. The Court held that there was no evidence that the defendant had any knowledge or notice of the defect and that the shipowner is not liable for injuries caused by a latent defect that a reasonable inspection would not have revealed.

■ It is apparent that Congress could not have intended that the shipowner be charged with knowledge of any latent defect since such a theory of liability would be a return to the unseaworthiness standard. Congress actually emphasized that negligence should be determined by traditional non-maritime standards. By allowing negligence to be imputed without any real opportunity for knowledge, the courts would be reinstating the doctrine of unseaworthiness that Congress terminated.

I am satisfied that there must be realistic opportunity for knowledge consistent with the practical everyday world of the shipping industry.

The language of *Partenweederei, MS BELGRANO v. Weigel*, 299 F.2d 897 (9th Cir.), *cert. denied*, 371 U.S. 830, 83 S.Ct. 49, 9 L.Ed.2d 67 (1962), is helpful as a pre-amendment maritime negligence case. A boom fell and struck the longshoreman because of a defect in the topping lift gear. The Ninth Circuit reversed the District Court because of the total absence of an evidentiary basis to support an inference of negligent inspection of the pawl and ratchet device. An analysis follows:

What did libelant establish? He established: (1) That the accident occurred; (2) That it occurred because of the malfunctioning of the pawl and ratchet device; and (3) That the stevedores discovered the malfunctioning of the device shortly after cargo loading operations commenced on the day before the accident. From these facts, libelant contends that the District Court properly inferred that a reasonable inspection by respondents would have revealed the cause of the malfunctioning. *The vice of that argument is the absence from the record of any testimony establishing, or tending to establish, the standard of conduct which respondents were required to meet in discharge of their duty to make a reasonable inspection to see that the gear and equipment furnished by them operated properly.* There is no testimony in the record of what conduct on the part of the operators and owners of vessels of the type or similar to the type of the BELGRANO and similarly equipped, was usual or customary or required by good practice or by law or regulation in making inspection of gear and equipment. Is the standard of conduct met by a visual inspection of the gear and equipment? Does the standard of conduct require an operational test of the gear and equipment of a vessel? Does the standard of conduct require constant inspection? Does the standard of conduct require daily inspection? Does the standard of conduct require inspection before and after each use of the gear and equipment? The record leaves us completely in the dark in attempting to find answers to these questions. 299 F.2d at 904. [Emphasis added.]

## ANALYSIS

■ Accepting the evidence in the light most favorable to the plaintiff and giving it every reasonable inference, plaintiff established that serving marline on a splice serves no useful function and that in fact the ability to inspect a splice is limited when it is wrapped. However, the uncontradicted evidence was that serving marline continues to be used by competent suppliers of equipment. While it does not contribute to the strength of the splice, there is a belief by some that it assists in protecting the hands of seamen. Plaintiff's evidence established that the vessel inspected the

gear on regular occasions, that the splice in the pendant was defective, that splices do not fail all at once but that portions of the wire pull out before there is a total failure. Plaintiff also introduced evidence to indicate that defects such as rust and corrosion could be observed by looking into the throat of the splice even with the serving marline on it. Evidence was inconclusive on whether or not a splice with a defect such as this one had could be observed by looking into the throat of the splice. Witness Platt testified that a bad splice could be identified by looking into the throat of it but this testimony came after he had previously indicated the defect was observable if it had started to pull or if there was any excess wear. No expert testified that this defect would probably have been observable at any time before this action. Captain McCurdy came the closest. On re-cross examination by plaintiff's attorney he testified:

Question: It's my understanding then, Captain, that if you had been in Astoria, at 7:59 a. m. with the longshoremen, going to work at 8:00 a. m., and you had been able to look at that splice with the marline on it, that you believe, in your personal opinion that you probably could have seen something going on?

Answer: By conjecture or opinion I think I might have seen something.

Plaintiff's witness Sievers testified:

Question: In the examination of gear, can you examine a pendant spliced with—that has a serving marline on it without removing the splice—the marline, rather?

Answer: In a walk-over survey you have to look at it awful close and a marline bulges if it—would bulge if the splice is starting to go. You could see there is something wrong but it takes a very proper, exacting examination. You can't just walk past it and see it.

All of the testimony about the defect being observable before the accident was based upon the assumption that either:

1. There was rust or corrosion or

2. That the splice was starting to go and "humped" up.

There was no testimony that there was any rust or corrosion involved. While there was testimony that a splice never went all at once, there was no testimony to indicate whether that meant that portions of the wire gave way seconds, hours or days before the final release.

There was no evidence from which the jury could have reasonably concluded that this defect was observable before the accident.

Neither was there any testimony indicating it was bad practice not to remove a marline as part of a routine inspection.

Probably the most significant fact however is that there was no testimony that anyone had ever heard of a splice pulling out under circumstances like this. The vang pendant was exposed to limited weight loads.

There was considerable testimony that longshoremen and stevedore crews are extremely safety conscious and make their own inspections of the cargo carrying gear on a regular basis. While it is true they were in the process of testing this gear, the existence of the marline on the splices was evident before the testing started. There was no testimony that stevedores on this or any other job ever requested the removal of the serving marline for inspection purposes.

The evidence is uncontradicted that the wire was comparatively new and had received limited use. It came to the shipowner with the marline on it. The splice is the strongest part of the vang pendant if done properly. The manufacturer who made the splice was competent and qualified. There was no expert testimony that it is good practice to remove the serving marline and inspect splices in the absence of some indication of rust, corrosion or bulging.

Plaintiff relies on *Sarauw v. Oceanic Navigation Corporation*, 655 F.2d 526 (9th Cir. 1981). There a gangway collapsed and the shipowner was held negligent for failure to discover and correct the improper way in which it was secured. The opinion

**32**

indicates that there was evidence to conclude that the officer in charge of the ship was responsible for seeing that the gangway was properly secured, that there should have been a gangway watch and that there was evidence to indicate that a reasonable watch would have disclosed the proper method of securing.

*Santos* is not helpful to the plaintiff. The court points out that there were facts indicating that the winch had been malfunctioning for two days before the accident. *Turner v. Japan Lines, Ltd.*, 651 F.2d 1300 (9th Cir. 1981) is distinguishable. In *Turner* the court pointed out that the ship's crew was responsible for insuring that the cargo was properly shored in the hold. The cage was not properly shored and it collapsed and injured the plaintiff. There was evidence in *Turner* from which the jury could have concluded that the shipowner in its affirmative duty would have had notice of the defective shoring.

### CONCLUSION

I simply cannot find any evidence, or draw any reasonable inferences from the evidence, that defendant knew or reasonably could have known that the splice was defective before this accident occurred.

The motion for judgment notwithstanding the verdict is allowed.