Sylvester HAYES and Mamie Lue
Hayes, his wife, Plaintiffs,

v.

WILH WILHELMSEN ENTERPRISES,
LTD., a foreign business corporation,
Partrederieni "Takara", a foreign busi-
ness organization, and Nissan Motor
Car Carrier Co., Ltd., a foreign business
organization, Defendants.

No. 82–695–CIV–J–14.

United States District Court,
M.D. Florida,
Jacksonville Division.

Dec. 6, 1985.

Gregory Johnson, Richard G. Rumrell,
Rumrell & Hunt, P.A., Jacksonville, Fla.,
for plaintiffs.

George D. Gabel, Jr., Wahl and Gabel,
Jacksonville, Fla., for defendant Nissan.

## OPINION

SUSAN H. BLACK, District Judge.

### Background

This case came on upon the Motion For
Reconsideration Of Order Denying Motion
For Summary Judgment of Nissan Motor
Car Carrier Company, Ltd. [hereinafter
"Nissan"], filed herein on September 30,
1985.[1] A hearing was held on the motion
on October 25, 1985.

Plaintiff, Sylvester Hayes, was a long-
shoreman who allegedly sustained an inju-
ry on July 5, 1979, while unloading cargo
from the vessel "Takara." He commenced
this action for damages against the vessel
owner, the vessel manager, and the time
charterer.[2]

Nissan bases its motion for summary
judgment on its status as a time charterer
of the vessel. The facts relating to the

---

1. Nissan's original Motion For Summary Judg-
ment was filed on July 1, 1985, and plaintiffs'
response in opposition was filed on August 7,
1985. In an Order entered September 18, 1985,
the Court initially denied the motion because a
legible charter was not filed with the Court.
See De Coelho v. Seaboard Shipping Corp., 535
F.Supp. 629, 635 (D.P.R.1982). However, on
September 30, 1985, Nissan filed the motion for
reconsideration, attaching a legible copy of the
time charter. On October 10, 1985, plaintiffs
filed a response initially opposing the Court's
reconsideration of the motion. Thereafter, at a
pretrial conference held October 10, 1985, the
parties indicated that they would be able to
stipulate to facts for the purpose of summary

judgment and requested the Court to rule on the
merits of the motion. The Court agreed to
reconsider the motion. Nissan's Supplemental
Memorandum of law In Support Of Motion For
Summary Judgment and Plaintiffs' response in
opposition were filed on October 21, 1985.

2. Plaintiffs have represented that they have set-
tled with the vessel owner, Partrederieni Ta-
kara, and the vessel manager, Wilh Wilhelmsen
Enterprises, Ltd. On September 25, 1985, Nis-
san filed an Answer to the Third Amended Com-
plaint and Cross-Claim for indemnity and con-
tribution against Wilh Wilhelmsen Enterprises,
Ltd. and Partrederieni Takara.

plaintiff's accident are not in dispute for the purpose of this motion. The only issue for the Court's determination is whether Nissan, as the time charterer, is liable for the plaintiff's accident.

## FINDINGS OF FACT

At the pretrial conference held October 10, 1985, plaintiffs and Nissan stated that they would provide stipulated facts relevant to the motion. In accordance with that understanding, the parties filed the following Stipulated Facts For Purpose Of Motion For Summary Judgment on October 16, 1985.[3]

1. Plaintiffs are citizens and residents of Jacksonville, Duval County, Florida.

2. Wilh Wilhelmsen Enterprises, Ltd. and Partrederieni Takara are business organizations, existing under and by virtue of the laws of Norway.

3. Nissan is a business organization existing under and by virtue of the laws of Japan.

4. At all times material hereto, Partrederieni Takara owned the vessel "Takara," which was a bulk carrier, converted to a car carrier in 1977.

5. At all times material hereto, the vessel, "Takara," was time chartered to Nissan, pursuant to a Time Charter dated December 21, 1977, a copy of which is attached hereto as Exhibit "A" and by reference made a part hereof.

6. On July 5, 1979, plaintiff, Sylvester Hayes, was employed by Strachan Shipping Company as a longshoreman to drive vehicles off the "Takara," which was docked at Blount Island in Jacksonville, Florida. The vessel was tied up at the dock at 0120 on July 5, 1979. By 0130, the hydraulically-operated cargo doors of the vessel were opened. Opening the doors was accomplished by use of a hydraulic system in which pressure is applied from hydraulic pumps at the focs'l which must be started by a mate, and pipes are closed to allow the pressure to build up. The cargo doors are operated by buttons located at each door. In order to release the pressure after opening the doors, the mate must return the focs'l to turn off the pumps and open the valves. The time charterer, Nissan, contracted with Strachan Shipping Company as its stevedore to accomplish discharge of the vehicles on behalf of Nissan and paid for their services. The longshoremen employed by Strachan came on board the vessel sometime between 0800 and 0820.

7. While performing his duties as a longshoreman on July 5, 1979, plaintiff Hayes boarded the "Takara" and slipped in hydraulic fluid which was on the entry deck of the vessel just inside the door.

8. The hydraulic fluid in which the plaintiff slipped came from the hoses of the hydraulically-operated cargo doors of the vessel, and not from any of the cargo of vehicles.[4]

---

**3.** These facts are only conceded for the purpose of summary judgment. Neither Nissan nor plaintiffs would be bound by these facts should the case proceed to trial.

**4.** The plaintiffs filed ten additional facts on October 16, 1985, which they requested the Court to consider for the motion. The following are the plaintiffs' Additional Uncontroverted Facts For Purposes of Motion For Summary Judgment to which Nissan has not stipulated:

1. Wilh Wilhelmsen operated the "Takara" through the Master and crew except during the discharge or unloading procedures when the Master and crew were working for Nissan.

2. Captain Tolstein Ringsoey, who served as chief officer of the "Takara" on July 5, 1979,

was a licensed master and captain for unlimited vessels and tonnages in unlimited waters. Captain Rinsoey (sic) had served as second or third mates and other positions on vessels operated by Wilh Wilhelmsen for twenty-five years. Captain Ringsoey previously served as Captain of the "Takara" in 1978 when Nissan was the time charterer. While being Captain of the "Takara," Captain Ringsoey became familiar with the Time Charter Agreement between Nissan and Wilh Wilhelmsen (which Agreement is attached to the stipulated facts).

3. Discharge of the "Takara" began immediately after she was tied up at Blount Island and continued until the vehicles were off loaded. After the "Takara" was tied up at

9. While not contained in the Stipulated Facts, Nissan agreed at the hearing that the Court could assume, for the purpose of summary judgment, that the fluid leaked from the hoses when the cargo doors were opened and that it was on the deck prior to the longshoremen boarding.

Blount Island, the Master and crew, including Captain Ringsoey, were working for Nissan.
4. It was the responsibility of the Master and crew to insure that the decks were inspected, cleaned and when there remained hydraulic fluid on the decks before it was cleaned, to warn longshoremen, including Mr. Hayes before Mr. Hayes came on board. These duties were performed while the Master and crew were working for Nissan.
5. All inspections made by the Master and crew, including Captain Ringsoey, were done while working for Nissan. Moreover, according to Captain Ringsoey if any injury occurred as a result of a longshoreman such as Mr. Hayes slipping on hydraulic fluid on the deck of the "Takara," Captain Ringsoey's custom and practice with Nissan under these facts would be to contact both Nissan and the owner.
6. During unloading and discharging of the cargo on the "Takara," the Master and crew were working for Nissan.
7. The opening of the cargo doors was part of the discharge or unloading procedure and was done by the Master and crew working for Nissan. The opening of the doors was part of the discharging procedure since the automobiles could not be discharged without the use and operation of the hydraulic cargo doors.
8. Hydraulic fluid which was located on the deck of the "Takara" by the cargo doors could have originated from the cargo doors only during the opening of the cargo doors before the longshoremen, including Mr. Hayes, came on board.
9. Captain Ringsoey, based upon his custom and previous work experience with Nissan, his custom of working with time charterers, and his knowledge of the Time Charter Agreement, was working for Nissan immediately after the vessel was tied up and all of the vehicles were off-loaded on July 5, 1979.
10. According to clause 9 of the Time Charter Agreement, if the time charterer has reason to be dissatisfied with the conduct of the Masters or officers, the owner was required to investigate and the owner could change the appointments based upon their dissatisfaction.

At the hearing on the motion, the Court discussed the relevancy and necessity of each of these additional facts with the attorneys for plaintiffs and Nissan. The Court has considered all the additional *facts* but many of the "additional facts" are conclusions of law.

Fact 1 is a conclusion of law which the Court cannot accept as a "fact." *See Turner v. Japan Lines, Ltd.,* 651 F.2d 1300, 1305–06 (9th Cir. 1981).

Fact 2 merely presents the Captain's background.

Fact 3's first sentence, as attorney for plaintiffs has conceded, is unnecessary. The second sentence is a conclusion of law which the Court cannot accept as a "fact."

Fact 4 also contains a conclusion of law. Moreover, the first sentence might not be accurate; it may be the responsibility of the stevedore to inspect for dangers to longshoremen. *See Scindia Stem Nav. v. Santos,* 451 U.S. 156, 170, 101 S.Ct. 1614, 1623, 68 L.Ed.2d 1 (1981). However, assuming the responsibility was with the Master and crew, the second sentence is a conclusion of law which the Court cannot accept as a "fact."

Fact 5's first sentence is a conclusion of law which the Court cannot accept as a "fact." The practice of the captain to contact the charterer and owner is not relevant to the motion.

Fact 6 is a conclusion of law which the Court cannot accept as a "fact."

Fact 7's first sentence is a conclusion of law which the Court cannot accept as a "fact." The second sentence is implicit in the stipulated facts and, thus, is not a necessary addition.

Fact 8, while not contained in the stipulated facts, has been conceded by Nissan for the purpose of summary judgment.

Fact 9 is a conclusion of law which the Court cannot accept as a "fact."

Fact 10 is unnecessary as the entire Time Charter is already incorporated into the Stipulated Facts.

Plaintiffs also request the Court to consider the Affidavit of Robert C. Stone, filed herein on October 9, 1985. Mr. Stone is a stevedore manager who stated that based on his experience, the hydraulic fluid should have been cleaned up by the Master or his crew. Mr. Stone further stated that at the time when the Master and Crew should have cleaned up the fluid, they were agents of the time charterer under the charter. According to Mr. Stone, the Master and crew were also agents of the time charterer for the purpose of warning the longshoremen. Mr. Stone's statements constitute conclusions of law which the Court cannot accept as facts for the purpose of the motion.

In addition, both Nissan and the plaintiffs have filed on October 25, 1985, and October 16, 1985, respectively, the deposition of Torstein Ringsoey, taken October 15, 1985. The parties have cited excerpts from the deposition in their memoranda and, therefore, the Court has reviewed the deposition and has given it consideration.

Having considered the facts, the parties' briefs and memoranda, and the arguments at the hearing, the Court makes the following conclusions of law.

## CONCLUSIONS OF LAW

This Court has jurisdiction over the parties and subject matter pursuant to Title 28 U.S.C. § 1332.

The issue in this case is whether under Clause 8 of the time charter, the time charterer is responsible for cleaning up and warning of hydraulic fluid which leaked onto the deck from hoses on the cargo doors when they were opened. Clause 8 of the Timer Charter provides:

> That the Captain shall prosecute his voyage with the utmost dispatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, trim, lash, unlash, and discharge the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally's Clerk receipts.

The Court's framework for analysis begins with the statute which provides the plaintiff with his cause of action. The Court then determines the division of responsibility between the vessel owner and the time charterer by examining the charter and analyzing the case law. For the foregoing reasons, the Court finds that the responsibility for cleaning up or warning of the fluid rests with the owner and not with the time charterer.

### Statute

The 1972 amendments to the Longshore and Harbor Workers' Compensation Act provide a right of action to longshoremen injured by the negligence of a vessel. 33 U.S.C. § 905(b)(1978). The term "vessel" includes the vessel's owner as well as the charterer. 33 U.S.C. § 902(21)(1978); *see also Mallard v. Aluminum Co. of Canada, Ltd.,* 634 F.2d 236, 242 n. 5 (5th Cir. 1981), *cert. denied,* 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85.

For the purpose of summary judgment, the parties have stipulated to facts which constitute negligence on the part of the "Takara." The fluid in which the plaintiff slipped was on the deck prior to the longshoremen boarding. Thus, the Master and crew had a duty to remove the fluid or warn the longshoremen, which they failed to do. This negligence of the master and crew is attributable to the vessel and, therefore, the plaintiff has properly brought this action against the "vessel." The question to be decided is whether "vessel" in this case refers to the time charterer or the owner. This question is answered by the time charter.

### Time Charter

The time charter in question, the New York Produce Exchange form, is widely used and has been construed frequently by the courts. *See e.g., Turner v. Japan Lines, Ltd.,* 651 F.2d 1300, 1306 (9th Cir. 1981); *Migut v. Hyman-Michaels Co.,* 571 F.2d 352, 354 (6th Cir.1978); *Fernandez v. Chios Shipping Co., Ltd.,* 542 F.2d 145, 151–53 (2d Cir.1976). While ordinarily the captain and crew are agents of the owner, under clause 8 of the charter they become agents of the time charterer for certain purposes. *See Migut,* 571 F.2d at 355; *Fernandez,* 542 F.2d at 151–53.

In *Fernandez,* a longshoreman was injured when a pallet, which was being used to unload cargo, came apart and spilled cargo on him. The court stated:

> When Clause 8 shifts the responsibility of proper discharge of cargo to the charterer, that responsibility includes whatever damage results from improper discharge, whether to the cargo or the personnel unloading it.

542 F.2d at 152. Having concluded that the injury was caused by improper discharge of cargo, the court found the time charterer liable to indemnify the owner under Clause 8.

Under a virtually identical Clause 8, the Sixth Circuit distinguished *Fernandez* in

*Migut v. Hyman-Michaels Co.*, 571 F.2d 352 (6th Cir.1978) (longshoreman died when he fell through an open hatch during loading operations). While not determining "whether or not clause 8 placed operational responsibility for loading and stowing upon the charterer," *id.* at 355, the court concluded that the open hatch through which the plaintiff fell was a condition that existed prior to cargo unloading and that the partially uncovered hatch served no purpose of the charterer. Therefore, the liability "resulted from acts or omissions of the captain which were not connected to cargo handling" and the charterer was entitled to indemnity from the owner. *Id.* at 355.

Similarly, in *Camiolo v. Felicitas-Rickmers Line K.G. & Co.*, 449 F.Supp. 18 (S.D.N.Y.1978), the court distinguished *Fernandez* by applying the cargo related test. The court stated:

> [I]n *Fernandez* the shift occurred where the injury complained of 'resulted from improper discharge' of cargo, i.e., from activity within the scope of responsibility accepted by the time-charterer in agreeing to Clause 8. In the instant case the injury is alleged to have come about because of an icy deck, a condition traditionally within the ambit of the shipowner's duty in a time-charter.... Moreover, this injury was in no way 'cargo-related' in the manner of *Fernandez*, where the plaintiff was injured in the very act of unloading the cargo. There is no reason to extend the holding of *Fernandez* to shift liability from shipowner to charterer in situations beyond the loading, stowing and trimming of cargo; absent manifest intention otherwise, the traditional division of responsibility between the charterer and the shipowner would continue to obtain if violence is not to be done to their contractual agreement. To the shipowner, by tradition and by contract, falls the duty to maintain decks in a seaworthy condition.

*Id.* at 20. *In accord Warnock v. Daiicha Chou Kisen Kaisha*, 1983 A.M.C. 1463 (D.Or.1981) (summary judgment for time charterer when plaintiff slipped on fluid on floor of hold while unloading cargo).

In the present case, clause 8 similarly shifts responsibility for cargo operations to Nissan. Accordingly, the Court will apply the cargo-related standard to determine if Nissan is liable for plaintiff's personal injuries.[5] The fluid on which the plaintiff slipped was hydraulic fluid which leaked from cargo doors. If the fluid had leaked from the cargo of vehicles or if negligent handling of the vehicles damaged the doors so that the fluid leaked, then the charterer might be responsible. However, the parties have stipulated that the fluid did not leak from the cargo nor is it claimed that the handling of the vehicles damaged the doors. The fluid leaked either through the operation of the cargo doors or because of some defect in the hoses which contain the fluid. The cargo doors are part of the vessel's equipment as a car carrier. The charterer did not bring this equipment onto the vessel for the purpose of transporting

---

**5.** The Eleventh Circuit, because it adopted the precedent of the former Fifth Circuit, *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981), may have adopted an interpretation of Clause 8 of the time charter which is inconsistent with that of the courts which hold a time charterer liable for cargo-related personal injuries. In *D/S Ove Skou v. Hebert*, 365 F.2d 341, 351–52 (5th Cir.1966), *cert. denied*, 400 U.S. 902, 91 S.Ct. 139, 27 L.Ed.2d 139 (1970), the court held that clause 8 makes a charterer responsible for the costs of cargo handling, but it does not transfer any operational control from the owner to the charterer. However, this case was decided prior to the 1972 amendments which afford an injured longshoreman a right of action against, among others, a charterer for negligence. Several lower courts have followed *D/S Ove Skou v. Hebert* even after the 1972 amendments. *See Shaw v. South African Marine Corp. and Burnham Shipping Corp. of Monrovia*, 1983 A.M.C. 1579, 1580 (E.D.Va.1982); *Desormeaux v. Oceans International, et al.*, 1979 A.M.C. 1962, 1964–65 (W.D.La.1979). Recently, the Fifth Circuit in *Mallard v. Aluminum Co. Of Canada, Ltd.*, 634 F.2d 236, 242 n. 5 (5th Cir.1981), declined to overrule *D/S Ove Skou*, stating: "In light of *Skou*, this circuit seems reluctant to find any shift of operational responsibility for personal injuries to the time charterer absent clear language to that effect." *Id.* However, in *Mallard*, the court reversed the grant of summary judgment for the time charterer as well as the owner. Thus, it is unclear whether the holding of *D/S Ove Skou* is still good law and binding precedent in this circuit.

the vehicles. The cargo doors are not within the scope of responsibility assumed by the time charterer under clause 8. Therefore, the fluid on the deck was not cargo-related and the Master and crew were not agents of Nissan when they negligently failed to clean up or warn of the fluid.

Plaintiff argues that because it was the custom and practice of the Master to begin discharge as soon as the vessel docked and because the cargo doors had to be opened to discharge the cargo, the Master and crew were agents of the charterer for the purpose of opening the doors. Plaintiff relies on *Turner v. Japan Lines, Ltd.*, 651 F.2d 1300 (9th Cir.1981), which he claims is on point. In *Turner*, a longshoreman was standing on the cargo of plywood, attaching hoisting gear to the top stack, when the stack of plywood tipped and collapsed beneath him. Evidence revealed that there was negligence on the part of a foreign stevedore in shoring the plywood which caused it to collapse under the longshoreman's weight. A jury found that the master negligently supervised the loading operation and thus there was negligence on the part of the vessel. The court then turned to clause 8 of the time charter to decide if the owner or time charterer or both were liable. The court found the time-charterer liable stating: "[B]ecause plaintiff's injury was caused by improper loading of cargo, we hold that the Time-Charterer must indemnify the Owner...." *Id.* at 1306. Thus, *Turner* is consistent with the interpretation of clause 8 which holds a time charterer liable for cargo-related personal injuries. *Turner* does not construe the charterer's responsibility under clause 8 as broadly as plaintiff asserts.

Other provisions in the time charter support the conclusion that the vessel owner is responsible for the cargo doors. Clause 1 of the time charter provides, in pertinent part: "That the Owners shall ... keep the vessel in a thoroughly efficient state in hull, machinery and equipment...." Clause 48 makes the owner responsible for sideparts and ramps used to load and unload vehicles. Clause 65 makes the owner responsible to correct problems of the vessel which delay the longshoremen. Finally, Clause 71 provides, in pertinent part: "The vessel to be suitable for the carriage of such unboxed cars as Roll On Roll Off pure car carrier. If corrective measures are necessary same are to be performed by Owners on their time and their expense."

While these provisions do not specifically mention cargo doors, the cargo doors are part of the vessel's equipment and their good-working order is necessary to load and unload the cargo. Under the provisions of the charter, the owner has assumed the responsibility of maintaining the vessel's equipment so that cargo can be loaded and unloaded. Defects in the cargo doors or problems in their operation, which cause fluid to leak, are the responsibility of the owner. Based on the intention of the parties as disclosed in the time charter, the time charterer did not assume responsibility for cleaning up or warning of fluid which leaked from the cargo doors when they were opened.

For the reasons stated in this Opinion, the Court will, by separate order on this date, enter summary judgment for defendant Nissan.