Martin FLYNN and Amelia Flynn, Plaintiffs,

v.

AMERICAN AUTO CARRIERS INC., Are/A Soya, Walleniusrederierna (Wallenius Lines) and International Marine Carriers Inc., Defendants.

American Auto Carriers Inc., Are/A Soya, Walleniusrederierna (Wallenius Lines) and International Marine Carriers Inc., Third–Party, Plaintiffs,

v.

The United States of America, Third–Party, Defendant.

The United States of America, Fourth–Party, Plaintiff,

v.

International Terminal Operating Co., Inc., Fourth–Party, Defendant.

No. CV 96–4310(RJD).

United States District Court, E.D. New York.

Feb. 24, 2000.

Martin Lassoff, New York City, for the plaintiff.

John M. Toriello, Haight Gardner Holland & Knight, New York City, for the defendants/third-party plaintiffs.

Arthur Joseph Gribbin, III, U.S. Department of Justice, New York City, for the third-party defendant/fourth-party plaintiff.

Michael N. Cotignola, Kalmus & Martuscello, New York City, for the fourth-party defendant.

---

## MEMORANDUM & ORDER

DEARIE, District Judge.

Plaintiff[1] Martin Flynn, a "checker" foreman who slipped and fell on the slick stern ramp of a seagoing shipping vessel, brings this action against the owners of the vessel, defendants American Auto Carriers Inc., Are/A Soya, Walleniusrederierna (Wallenius Lines) and International Marine Carriers Inc. (hereinafter the "Shipowners") pursuant to the Longshore and Harbor Workers' Compensation Act ("LHWCA" or the "Act"), 33 U.S.C. section 905(b). The Shipowners have impleaded third-party defendant the United States of America ("Government"), the owner of the cargo being loaded at the time of plaintiff's accident. The Shipowners seek indemnification from the Government as a result of personal injury to plaintiff sustained during the cargo-loading process. The Government, in turn, has impleaded plaintiff's employer, fourth-party defendant International Terminal Operating Co., Inc. ("ITO" or the "Stevedore"), asserting that the Stevedore is contractually liable to the Government for any personal injury to longshoremen that is attributable to the Stevedore's negligence. Predictably, the Shipowners, the Government, and the Stevedore all deny responsibility for clearing snow and ice from the stern ramp.

The Shipowners move for summary judgment on plaintiff's personal injury claims and on their own cross-claim for contractual indemnity against the Government. The Government cross-moves for summary judgment on the Shipowners' indemnity claim.

On the issue of negligence, material questions of fact abound. The Shipowners' motion for summary judgment on plaintiff's personal injury claims is therefore denied. As explained below, however, the Court concludes that the Government

---

1. Plaintiff's wife, Amelia Flynn, brings a derivative action against the Shipowners for the loss of her husband's consortium.

is required to indemnify the Shipowners for any of the Shipowners' negligent acts or omissions occurring during and in relation to cargo operations that resulted in plaintiff's injury.

## BACKGROUND

### A. *The Relevant Contracts*

The following facts are undisputed. The M/S Faust (hereinafter the "Vessel") is a "Ro–Ro" (roll on/roll off) vessel designed to carry vehicular cargo. The Vessel is equipped with a retractable stern ramp over which vehicular cargo is loaded and unloaded during cargo operations. Rule 56.1 statement of defendant Shipowners in support of summary judgment ("Def. R. 56"), dated September 30, 1998, ¶ 1.

On February 23, 1994 at 9:00 p.m., the Vessel called at the Military Ocean Terminal at Bayonne, New Jersey ("MOTBY") in order to discharge and load a cargo of Government vehicles pursuant to the Military Sealift Command ("MSC") Shipping Agreement and Rate Guide (the "MSC Agreement"), effective June 1, 1993, entered into between the Shipowners and the Government. The MSC Agreement sets out the terms and conditions of various ocean liftings of Government cargoes by vessels owned or operated by the Shipowners. Def. R. 56 ¶ 2.

Pursuant to § C–8(e) of the MSC Agreement, "the Government or the consignee shall bear all expenses of loading, stowing, and discharging the cargo, such as lighterage (including loading and discharging costs in connection therewith), stevedoring, [and] checking . . . ." MSC Agreement, Exh. H, attached to affidavit of Arthur J. Gribbin, attorney for the Government ("Gribbin Aff."), dated October 1, 1998.

At the MOTBY facility, the Government contracted with fourth-party defendant ITO to provide all stevedoring services for the United States (hereinafter the "stevedoring contract"). The stevedoring contract provides that the Stevedore shall be "[r]esponsible for, and hold the Government harmless from bodily injury and death of persons, occasioned either in whole or in part by the negligence or fault of the contractor [ITO] . . . in the performance of work under this contract [to perform the stevedoring services]." Exh. D, Gribbin Aff.

The Government also contracted with Backhoe Services, Inc. to provide snow and ice removal services at MOTBY (hereinafter the "Backhoe" contract). Def. R. 56 ¶ 4. Section C.1 of the Backhoe contract provides that "the contractor [Backhoe] shall furnish equipment and operators to perform emergency snow plowing and removal services at Military Ocean Terminal, Bayonne, New Jersey, as and when required by the government." Exh. 10, affidavit of John Toriello, attorney for the Shipowners, dated September 30, 1998 ("Toriello Aff."). The Government asserts that under the Backhoe contract, Backhoe was responsible for salting and plowing only the terminal area at MOTBY, not the stern ramp of the Vessel. Government's Rule 56.1 Statement in support of summary judgment, dated October 1, 1998 ("Gov. R. 56") ¶ 21.

### B. *The Events of February 24, 1994*

#### 1. *Plaintiff's accident*

Plaintiff became a marine carpenter in 1962 and acted in that capacity until 1978, when he became a checker. From 1978 until the present he has been employed as a checker, and, on February 24, 1994, he occupied the position of checker foreman. Def. R. 56 ¶ 12.

As a checker foreman, plaintiff was responsible for compiling and verifying various paperwork associated with the carriage of ocean cargoes, such as bills of lading, warehouse receipts, and trucking documents. He also supervised other checkers who would periodically check the cargo to be loaded or unloaded from vessels against these various documents. Def. R. 56 ¶ 13.

Plaintiff testified that at approximately 11:00 a.m., he began to disembark the

Vessel after giving orders to workers under his supervision. Flynn Dep. at 28, 32. The ramp was visibly covered with snow and ice when he began his descent along the stern ramp. *Id.* at 34. When he reached an area approximately 15 to 20 feet down the ramp, he moved to the port side of the ramp in order to avoid tanks being loaded at that time. *Id.* at 35. Upon doing so, he "did a flip" and landed on his knees. He thought he "must have kicked one of them black ice or whatever it's called, you can't really see it, which sometimes it gets dirty." *Id.*

### 2. *Conflicting testimony over responsibility for stern ramp*

Employees of ITO and the Government testified during depositions that the Shipowners are responsible for clearing the stern ramp, while employees of the Shipowners testified that the Government or the Stevedore was responsible for clearing it. For example, Mr. Robert Kochanski, the "safety man" employed by ITO, testified that he would perform his own inspection of the Vessel for the safety of ITO employees. Kochanski Dep. at 24. Kochanski acknowledged that he was required to make sure that slippery conditions in the areas being used by longshoremen were eliminated as they occurred. *Id.* However, Kochanski asserts that if there were rain or an accumulation of snow or ice on the ramp, he would have the ship's crew clean it up. *Id.* at 38–39. "It's up to the ship to keep the ramp clean." *Id.* at 34.

In contrast, Crew member Steven Kayser, Chief Officer of the Vessel, denied that it was the Vessel's duty to clear ice and snow from the stern ramp. Kayser Dep. at 80. Kayser acknowledged that during cargo operations part of his job is to see that the ramp is safe for the longshoremen to go on and off. *Id.* at 29–30. However, he testified that this duty is limited to checking for prior defects and to make sure that the ramp was secured and functioning properly. *Id.* at 80–82. When asked "if you had hot water and you had snow and ice on the ramp, would you use that hot water to melt the snow and ice to clear the ramp," Kayser answered "no." "It's not our job to do snow removal. We don't have the equipment." *Id.*

### 3. *Backhoe's de-icing activities*

The Ship Superintendent employed by the Stevedore, Anthony Caputo, testified that Government contractor Backhoe salted the stern ramp on at least two occasions on February 24, 1994 at the request of Government employees. Caputo Dep. at 36. Caputo testified that between 6:00 a.m. and 6:30 a.m., longshoremen were complaining that the stern ramp was slick. Caputo approached the crew of the Vessel, who explained to Caputo that the Vessel did not have de-icing materials. *Id.* at 35. According to Caputo, the crew approached Marine Cargo Specialist Tim O'Sullivan, an employee of the Government, about the icy stern ramp. At Mr. O'Sullivan's direction, Backhoe's salt truck spread salt on the stern ramp. *Id.* at 36.

Mr. Caputo inspected the ramp after Backhoe had finished and found the ramp to be in good condition. *Id.* at 68–70. He testified that if he had found anything which would lead him to believe that there was an unsafe condition, he would not allow cargo operations to commence. *Id.* at 23. Instead, he would "go to the ship's crew and tell them to correct the situation until such time that we can work." *Id.*

At 6:15 a.m. on the day of the accident, the Vessel was "turned over" to the Stevedore. Exh. 5, M/S Faust deck log dated February 24, 1994, Toriello Aff. At around 9:00 a.m., a second request was made to Mr. O'Sullivan to ask the truck to salt the ramp. As a result, either Mr. O'Sullivan or Mr. James Aiello, the Government's Safety Specialist, agreed to have the Backhoe truck come back up to resalt the ramp. *Id.* at 68–70. During the approximately two hours between the Government's second request to Backhoe and plaintiff's accident on the stern ramp at 11:00 a.m., Mr.

Caputo again inspected the ramp and found no dangerous conditions. *Id.*

The Shipowners assert, and the Government does not deny, that the Government never back-charged the Shipowners for Backhoe's snow removal services. *See* Backhoe service invoice for February 24, 1994, attached to defendant's Request to Admit, Exh. 15, Toriello Aff. According to Mr. O'Sullivan, however, he requested Backhoe to salt the stern ramp not because the Government was required to do so, but rather to "help out a situation and make a situation from turning worse." O'Sullivan Dep. at 33.

### 4. *ITO's transport vehicles*

ITO provides vehicles for longshoremen and checkers to safely board and disembark the Vessel. On February 24, 1994, this transportation was in "constant" operation during loading operations. Def. R. 56 ¶ 9. As a result, longshoremen and checkers were not required to walk on the stern ramp. *Id.* Mr. Caputo testified that he did not consider it "proper" for plaintiff to walk on the stern ramp on February 24, 1994 in light of the inclement weather and the danger of cargo equipment being brought up and down the ramp. Caputo Dep. at 43, 73; Def. R. 56 ¶ 10. However, "a lot of men felt it speedy to walk down a ramp and get on the bus" at the pier rather than board the buses on the ship itself. Caputo Dep. at 73. ITO did not instruct the longshoremen and checkers that they should only traverse the ramp via the transport vehicles. *Id.* at 74.

### 5. *Evidence that snow and ice were tracked onto stern ramp during loading operations*

#### a. *The accident report*

Mr. Robert Gallagan, ITO's Building Superintendent, authored the "ITO Superintendent's Accident Investigation Report" relating to plaintiff's accident. Exh. 4, Toriello Aff. Pursuant to the contract between ITO and the Government, Gallagan was required to attend an "operations meeting" with the Government every morning at 10:30 a.m. Gallagan Dep. at 12. Gallagan testified that prior to the operations meeting on February 24, 1994, he visited the Vessel. *Id.* at 20. He walked up and down the stern ramp and did not see any danger or slippery materials. *Id.* He explained that if he had seen slippery materials, he would have brought it to the attention of Mr. Caputo, the ITO employee serving as the Ship Superintendent. *Id.*

After learning of plaintiff's accident, Gallagan went back to the Vessel, examined the scene, and wrote the accident report. Gallagan Dep. at 24, 26. In his report, Gallagan noted that "there was some ice and snow in one small area." Exh. 4, Toriello Aff. This notation was based both on his observation of the ramp and what he was told. Gallagan Dep. at 28. He wrote that "we had ramp cleared of ice and snow, but the pier area was not properly cleared by Army," Exh. 4, Toriello Aff.; that "vehicles from unclear areas tracked snow on ramp," *id.*; and that "Army failed to clear snow." *Id.* Gallagan testified that his belief that the cargo had tracked the snow onto the ramp was based on the fact that:

> "I had been going at the Army about clearing the snow for months, and I, that particular day, as I recall, I had had problems with my buildings where they hadn't properly cleared the snow, and I had seen snow, you know, that needed to be cleared."

Gallagan Dep. at 34. Gallagan testified that he had never actually seen snow or ice coming off the vehicles being loaded and could not remember ever before seeing vehicles tracking snow or ice onto a ship. *Id.* at 33–34.

#### b. *Testimony of plaintiff and ship superintendent*

Plaintiff testified that he slipped and fell on snow and ice that had been tracked onto the stern ramp by the vehicular cargo.

Q: Do you know if you slipped on snow?

A: There was—the stuff that was down—it's like in a graded—where there is ice and all that stuff, and snow and all that. As these [cargo] tanks were coming on, they were spewing snow on and off, as they're coming on this ramp and they were still being thrown around on this ramp. They were still covered with snow out in the field.

Flynn Dep. at 37. Also, in response to the question "did you see any vehicles tracking snow onto the ramp of the Faust" just before plaintiff's accident, Caputo testified that "I would say it would be probable, yes." Caputo Dep. at 101.

### 6. *Evidence that Shipowner employees engaged in snow removal efforts*

Longshoreman Joseph Schettino testified that he saw four or five members of the ship's crew salting the stern ramp during the three hour delay between 6:00 a.m. and 9:00 a.m. Schettino Dep. at 25–26. These employees of the Shipowners, dressed in "orange suits," were "trying to throw down" bags of salt along the sides of the ramp, which were covered with "sheets of ice." *Id.*

### DISCUSSION

#### A. *Negligence*

##### 1. *Shipowner liability under LHWCA*

Prior to the 1972 amendments to the LHWCA, a longshoreman could recover from a shipowner for the ship's unseaworthiness, which could be proven merely by showing that a dangerous condition existed on the ship. *Scindia Steam Navigation Co., Ltd. v. De Los Santos, et al.*, 451 U.S. 156, 165, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). Once a shipowner was found liable under an unseaworthiness theory, it could recover over against a stevedore for its breach of express or implied warranty to handle the cargo in a reasonably safe manner. *Id.* at 164–65, 101 S.Ct. 1614.

The 1972 amendments to the Act substantially increased the compensation payments from the stevedore to the longshoreman for injuries incurred during the longshoreman's employment; abolished the longshoreman's cause of action against the shipowner for unseaworthiness; abolished the stevedore's duty to indemnify the shipowner if the latter were held liable to longshoremen; and provided a "statutory negligence action" against the shipowner. *Id.* at 165, 101 S.Ct. 1614.

However, while the LHWCA as amended provides a right of action against a shipowner for negligence only, section 905(b) does not specify what acts or omissions constitute negligence on the part of the ship, "and neither can it be said that the legislative history ... furnishes sure guidance for construing sec. 905(b)." *Scindia*, 451 U.S. at 165, 101 S.Ct. 1614. "Nor did Congress make clear the interrelation between the duty owed the longshoremen by the shipowner, and that owed by the stevedore." *Lieggi v. Maritime Co. of the Philippines*, 667 F.2d 324, 327 (2d Cir.1981). In particular, the amendments "left unclear exactly what duty the shipowner owes the longshoremen once cargo operations, over which the stevedore generally has primary control, have begun." *Id.* Instead, Congress left the determination of shipowner negligence to the "application of accepted principles of tort law and the ordinary process of litigation." *Scindia*, 451 U.S. at 166, 101 S.Ct. 1614 (quoting S.Rep. No. 92–1125, p. 10 (1972)).

With respect to the relationship between the stevedore and the shipowner, the Supreme Court in *Scindia* observed:

As a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards. Section 41 of the Act, 33 U.S.C. sec. 941, requires the stevedore, the longshoremen's employer, to provide a "reasonably safe" place to work and to take such safeguards with respect to equipment and working conditions as the Secretary of Labor may determine

to be necessary to avoid injury to longshoremen. The ship is not the common employer of the longshoremen and owes no such statutory duty to them. Furthermore, as our cases indicate, the stevedore normally warrants to discharge his duties in a workmanlike manner; and although the 1972 Amendments relieved the stevedore of his duty to indemnify the shipowner for damages paid to longshoremen for injuries caused by the stevedore's breach of warranty, they did not otherwise disturb the contractual undertaking of the stevedore nor the rightful expectation of the vessel that the stevedore would perform his task properly without supervision by the ship.

*Id.* at 170, 101 S.Ct. 1614 (footnotes omitted).

The *Scindia* Court recognized three distinct duties, commonly known as "*Scindia* duties," owed to a maritime worker by a shipowner. The first, known as the "turnover duty," requires the shipowner to exercise ordinary care to assure that the ship and its equipment are turned over to an outside contractor " 'in such condition that an expert and experienced [contractor] . . . will be able by the exercise of ordinary care' to carry on cargo operations." *Bradford v. The BARGE B–10*, 1999 WL 1256248 (December 27, 1999) *2 (quoting *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994)). The second provides that a shipowner must exercise reasonable care to prevent injuries to marine workers in areas that remain under the "active control of the vessel." *Howlett*, 512 U.S. at 98, 114 S.Ct. 2057. The third, called the "duty to intervene," concerns the vessel's obligation to warn or intervene when the vessel has actual knowledge that a worker is about to face an unreasonable hazard due to the stevedore's exercise of "obviously" improvident judgment. *Scindia*, 451 U.S. at 175, 101 S.Ct. 1614.

The Second Circuit has refined the shipowner's *Scindia* duty to intervene in the context of transitory conditions arising during the course of cargo operations:

> Our Court has formulated a more general principle, applicable not only to the ship's gear but also to transitory conditions on the ship, that if the shipowner knows of the dangerous condition and should anticipate that, even if the condition is obvious, *the stevedore will not or cannot correct it and the longshoremen will not or cannot avoid it*, the shipowner has a duty to take reasonable steps to eliminate or correct the condition.

*Lieggi*, 667 F.2d at 328 (citing *Evans v. Transportacion Maritime Mexicana S.S. "Campeche"*, 639 F.2d 848, 855–56 (2d Cir. 1981)) (emphasis added). *See Moore v. M.P. Howlett, Inc.*, 704 F.2d 39, 42 (2d Cir.1983) (" 'The *sine qua non* of a ship's liability for an obviously dangerous condition arising during the process of loading or unloading is reasonable anticipation that the longshoremen will not be able to avoid it' ") (quoting *Giglio v. Farrell Lines, Inc.*, 613 F.2d 429, 432–33 (2d Cir.1980)).

### 2. Disputed issues of fact preclude summary judgment

█ The Shipowners argue that its employees had no knowledge of a dangerous condition on the ramp at the time of plaintiff's fall and that, even if crew members knew of the dangerous condition, they reasonably expected that the Government or ITO could and would correct it and that the longshoremen and checkers could and would avoid it.

As to the assertion that the Shipowners were unaware of the dangerous condition, the evidence suggests otherwise. It is undisputed that Steven Kayser, Chief Officer of the Vessel, was on board the Vessel at all times during the cargo loading process. Further, the parties agree that the Ship Superintendent, an ITO employee, approached crew members about the "slick" stern ramp in the early morning. The crew members approached Marine Cargo Specialist Tim O'Sullivan about the problem, who agreed to have Backhoe salt the

stern ramp. At the very least, therefore, there exist material issues of fact as to whether the Shipowners were aware of the dangerous condition.

Plaintiff has also raised genuine issues of fact as to whether the Shipowners should have known that the Government or ITO would not or could not correct the potential dangers posed by the slick stern ramp or that longshoremen and checkers could not or would not avoid it.

As a preliminary matter, it should be noted that the Stevedore and the Government indisputably undertook efforts to clear the stern ramp and the Shipowners apparently relied on those efforts. The Vessel was "turned over" to the stevedore at approximately 6:00 a.m., and plaintiff's slip and fall occurred almost five hours later. The Shipowners were aware that the Government had ordered its contractor Backhoe to salt the stern ramp on two occasions on the morning of the accident. Stevedore superintendent Caputo checked the ramp after the salting on two separate occasions before plaintiff's accident and found it to be safe. Furthermore, all agree that the Stevedore provided constant transportation on and off the Vessel and that Mr. Caputo expected the longshoremen and checkers to use this transportation. There is therefore ample evidence from which a factfinder could conclude that the Shipowner reasonably relied on the Government and the Stevedore to clear the stern ramp for the safety of longshoremen.

■ Nevertheless, plaintiff has proffered sufficient evidence which, if credited, could lead a reasonable jury to conclude that the Shipowners' reliance on the Government and the Stevedore was not reasonable. While the Stevedore bears primary responsibility for the safety of longshoremen once cargo operations have begun, finding that one entity is negligent under the LHWCA does not preclude finding that another entity is also contributorily negligent. *See Randall v. Chevron U.S.A., Inc.,* 13 F.3d 888 (5th Cir.1994), overruled on other grounds by *Bienvenu v. Texaco,* 164 F.3d 901 (5th Cir.1999); *Turner v. Japan Lines, Ltd.,* 651 F.2d 1300, 1303–05 (9th Cir.1981).

Although the Stevedore provided transport vehicles to traverse the stern ramp, plaintiff notes that at least two individuals besides himself—Caputo and fellow longshoreman Schettino—testified that checkers and longshoremen frequently did not use them. A factfinder could reasonably conclude that longshoremen would not avoid the slick ramp. Also, Schettino and plaintiff assert that the Backhoe salt truck's de-icing activities were clearly inadequate. Plaintiff and the Government do not concede that the truck actually went up the ramp a second time. From this, a factfinder could conclude that it was not reasonable, under icy conditions and after Backhoe's single trip up the ramp, for the Ship's crew to rely on Mr. Caputo's inspection of the ramp and his conclusion that there were no dangerous conditions.

Finally, plaintiff points to longshoreman Schettino's testimony that he saw members of the Ships's crew salt the stern ramp between 6:00 a.m. and 9:00 a.m. This testimony, if credited by a factfinder, could support a finding that the Shipowners believed that the Government's and the Stevedore's snow-clearing efforts were insufficient to obviate the danger.[2]

2. Plaintiff also argues that evidence of the crew members' salting the ramp after it was turned over to the Stevedore supports the proposition that shipowners have an ongoing, "nondelegable duty" to keep a ramp clear when it is the sole means of access to a vessel. Pl.Mem. at 6. As support for his "nondelegable duty" argument, plaintiff cites *Sarauw v. Oceanic Nav. Corp.,* 655 F.2d 526 (3d Cir.

1981), in which the Third Circuit found a shipowner liable for damage occurring on a gangway that was the sole means of ingress and egress. This case is inapposite. The *Sarauw* court found that the gangway, an "essential appurtenance of the ship," had not been properly secured to the ship *before* cargo operations commenced. *Id.* at 529. Nowhere did the court state that a shipowner

At a minimum, plaintiff raises genuine issues as to whether the Shipowners adequately exercised their *Scindia* duty to intervene. For this reason, the Court denies the Shipowners' motion for summary judgment on plaintiff's negligence claim.

## B. *Indemnity*

■ The Shipowners claim that § C–8 of the MSC Agreement between itself and the Government ("Section C–8") shifts responsibility to the Government for any injuries occurring during stevedoring, checking and cargo operations for which the Shipowners may be found liable. Section C–8 of the MSC Agreement provides, in pertinent part:

> The Government or the consignee shall bear all expenses of loading, stowing and discharging the cargo, such as . . . stevedoring [and] checking . . .
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Cargo shall be loaded, stowed, trimmed and secured by the Government under the supervision and to the satisfaction of the master.

Exh. H, Gribbin Aff.

Because a shipowner may only be found liable for negligence under the LHWCA, the Shipowners effectively assert that Section C–8 entitles them to indemnification from the Government for their own negligence. The Shipowners rely on *Fernandez v. Chios Shipping Co.*, 542 F.2d 145 (2d Cir.1976), where the Second Circuit held that a virtually identical clause in a time charter agreement required a charterer to indemnify a shipowner for a longshoreman's personal injuries that occurred as a result of the ship's crew's failure to remedy a dangerous condition.

The Government argues that *Fernandez* is inapposite because the Agreement between itself and the Shipowners is not a time charter and because, in any event, *Fernandez* indemnity is inapplicable to actions sounding in negligence. The Shipowners and the Government both move for summary judgment on this indemnity claim.

### 1. *Construing an indemnification clause*

■ The MSC Agreement is a "maritime contract," since it outlines the terms under which the Shipowners agree to transport Government cargo by sea. *See* 1 Benedict on Admiralty S 183 (7th ed.1985) ("contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea" is characterized as a maritime contract). *See Booth Steamship Co., Ltd. v. Meier & Oelhaf Co.*, 262 F.2d 310, 312 (2d Cir.1958) (express and implied indemnification clauses in contract between stevedoring company and shipowner are maritime contracts). The construction of a maritime contract is governed by federal maritime law, even in a diversity case. *North Pacific S.S. Co., v. Hall Bros. Marine Railway & Shipbuilding Co.*, 249 U.S. 119, 125, 39 S.Ct. 221, 63 L.Ed. 510 (1919); *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953); *Crosson v. N.V. Stoomvaart Mij 'Nederland'*, 409 F.2d 865, 866 (2d Cir.1969).

■ When interpreting a maritime indemnity contract, federal courts apply general contract principles to determine the respective rights of the parties involved. *See Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 199 (2d

---

has a nondelegable duty to monitor the safety of a gangway or entrance ramp once it is under active control of the stevedore during cargo loading operations. In any event, a finding of such a "nondelegable duty" might well be contrary to the law of this Circuit. *See Lieggi*, 667 F.2d at 328 ("shipowner has no general duty to discover an unsafe condition arising during stevedoring operations").

Under similar circumstances, other jurisdictions have held likewise. *See Giacona v. Marubeni Oceano (Panama) Corp.*, 623 F.Supp. 1560, 1563–66 (D.Tex.1985) (court concludes that shipowner is not responsible for slippery condition on gangplank that arose during cargo operations, even though gangplank was sole means of access to vessel).

Cir.1992); *United States Fire Insurance Co. v. S.S. "LION'S GATE BRIDGE"*, 1997 WL 10923 (Jan. 10, 1997). Federal maritime law adheres to the general rule that where the indemnitee is solely at fault for the injuries, the indemnity clause will not be construed to indemnify a person against his own negligence unless 1) such intention is expressed in unequivocal terms, or 2) the court is otherwise "firmly convinced that such an interpretation reflects the intention of the parties." *United States v. Seckinger*, 397 U.S. 203, 211–213, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970).

The reluctance to construe clauses as indemnifying against a party's own negligence arises "frequently in a context in which the indemnitee was solely or principally responsible for the damages." *Id.* at 212, 90 S.Ct. 880. The Supreme Court has explained that this reluctance "is particularly applicable" when, unlike in the instant case, the party invoking the indemnity provision benefits from "a vast disparity in bargaining power and economic resources ... such as exists between the United States and particular government contractors." *Seckinger*, 397 U.S. at 211, 90 S.Ct. 880. Even under those circumstances, however, the Supreme Court "has expressly declined to require, as indicia of an intent to indemnify a party against the consequences of his own negligence, an express provision to that effect." *Capozziello v. Brasileiro*, 443 F.2d 1155, 1157 (2d Cir.1971). Finally, where the language of an indemnity agreement is susceptible to two "reasonable and practical interpretations," the language "should be construed most strongly against the drafter." *Seckinger*, 397 U.S. at 210, 90 S.Ct. 880 (construing purported indemnification clause against the drafting party, the United States government); *American Export Isbrandtsen Lines, Inc. v. United States*, 390 F.Supp. 63, 65 (S.D.N.Y. 1975); *see also Mitsui & Co., Ltd. v. American Export Lines, Inc.*, 636 F.2d 807, 822–23 (2d Cir. 1981).

2. *Fernandez indemnity for Personal injury*

The Shipowners rely on *Fernandez v. Chios Shipping Co.*, 542 F.2d 145 (2d Cir. 1976) for the proposition that Section C–8 of the MSC Agreement shifts responsibility to the Government and its agents for injuries occurring during stevedoring, checking and cargo operations. Although decided September 16, 1976, *Fernandez* was based on pre–1972 amendment law because the injury occurred on September 1, 1968. Fernandez was injured by a pallet of pineapples that came apart and dropped as it was being lifted from a cargo hold. *Id.* at 148. He sued the shipowner on theories of negligence and unseaworthiness, but the negligence claim was dismissed by the court. *Id.* at 148 n. 2. The shipowner sought indemnification from the time charterer,[3] the stevedore and the shipper who constructed the pallet. The time charterer then cross-claimed for indemnification from the stevedore, and both the time charterer and the stevedore sought indemnification from the shipper. *Id.* at 149.

Affirming a jury verdict in which the shipowner received indemnification from all of the other parties, the Second Circuit held that the following language in Clause 8 of the New York Produce Exchange–Approved Time Charter ("Clause 8" of the "NYPEA Time Charter"), entered into between the shipowner and the time charterer, bound the time charterer to indemnify the shipowner for the longshoreman's personal injury:

> The Charterers are to load, stow, trim and discharge the cargo at their expense under the supervision of the Captain ...

---

**3.** The Glossary of the MSC Agreement in the instant case defines "Charterer" as "one who leases a ship or part of its cargo space. A vessel may be hired or leased from its owners while or in part for a voyage, a single or round trip, or a stated period, under what is known as trip, or time charter." Glossary of MSC Agreement, Exh. H, Gribbin Aff.

*Fernandez,* 542 F.2d at 151. The court observed that *Nichimen Co. v. M/V Farland,* 462 F.2d 319 (2d Cir.1972) had held that Clause 8 shifts responsibility from the shipowner to the charterer for damage to cargo occurring during loading and discharging operations. *Fernandez,* 542 F.2d at 151–52. The *Fernandez* court reasoned that "[w]hen Clause 8 shifts the responsibility of proper discharge of cargo to the charterer, that responsibility includes whatever damage results from improper discharge, whether to the cargo or to the personnel unloading it." *Id.*

The court found that the longshoreman's injury was caused by the stevedore's failure "properly to supervise and provide for the safety of its employees during unloading operations." *Id.* The court concluded:

> Since the cause of the damage, improper discharge of cargo, is within the scope of responsibilities shifted from Shipowner to Time Charterer by Clause 8, the Time Charterer is obligated to indemnify the Shipowner.

*Id.* at 152.

The Shipowners in the instant case point out that Clause 8 of the NYPEA Time Charter is virtually identical to the language of Section C–8 of the MSC Agreement.[4] The two are distinguishable only in that the MSC Agreement requires the Government to bear all expenses not only with respect to the "discharge of cargo"— the language at issue in *Fernandez* —but also with respect to "stevedoring" and "checking." Applying *Fernandez,* the Shipowners urge that Section C–8 of the MSC Agreement, like Clause 8 of the NYPEA Time Charter, represents an agreement by the Government to indemnify the Shipowners for personal injuries occasioned, at least in part, by the negligence of the Shipowners during cargo operations.

The Government attempts to distinguish *Fernandez* on both legal and factual grounds. As explained below, the Court finds that these distinctions do not support a conclusion substantially different from that reached in *Fernandez.*

### a. The applicability of Fernandez to non-charter party

The Government first argues that *Fernandez* indemnity applies only to relationships arising under time charters. The Government correctly points out that all Clause 8 indemnification cases have involved time charters, and the Shipowners concur that the MSC Agreement between itself and the Government is not a "time charter." Rather, the MSC Agreement defines itself as an "ocean carriage contract." Gov.Mem. at 17; Def.Opp. at 7. According to the Shipowners, however, this is a distinction without a difference for purposes of determining the question before the Court. For purposes of construing § C–8 of the Agreement, the Court agrees.

This Court has found no case analyzing, or even mentioning, § C–8 of an ocean carriage contract entered into by the Military Sealift Command or any other entity. Mr. Antonio Hines, a Government contracting officer involved in the drafting of service contracts identical to the MSC Agreement at issue here, represents to the Court that "to my knowledge, this is the first known case of this kind seeking indemnification" for a longshoreman's personal injuries. *See* Affidavit of Antonio Hines, Contracting Officer for the Universal Service Contracts, dated August 6, 1998 ("Hines Aff.") ¶ 7. In the absence of any authority analyzing § C–8, therefore, a comparison of the attributes of time

---

4. Section C–8 of the MSC Agreement provides, in pertinent part:

> The Government or the consignee shall bear all expenses of loading, stowing and discharging the cargo, such as ... stevedoring [and] checking ...

> \*\*\*
> Cargo shall be loaded, stowed, trimmed and secured by the Government under the supervision and to the satisfaction of the master.

> Exh. H, Gribbin Aff.

charters with the MSC Agreement is in order.

Time charters share certain undisputed features. Typically, the shipper of cargo engages a charterer, or "charter party," which in turn engages either the entire vessel or a designated portion of the cargo area for a stated term. *Asprogerakas v. Mol Tankship Management, Ltd.*, 1998 WL 760291 *1 (E.D.N.Y. August 31, 1998); *see Klishewich v. Mediterranean Agencies, Inc.*, 302 F.Supp. 712, 712–713 (E.D.N.Y. 1969); *see* Glossary of MSC Agreement, Exh. H, Gribbin Aff. Under a charter, possession and control of the vessel remain with the shipowner, and the ship is operated by its regular crew. *Id.; see Migut v. Hyman–Michaels Co.*, 571 F.2d 352 (6th Cir.1978). On the other hand, the charterer determines the ship's routes and destinations. *Klishewich*, 302 F.Supp. at 713. The shipowner pays the ordinary running expenses of the vessel and the charterer pays "such of the expenses as are specifically incidental to the trade under which it employed her." *Dampskibs Aktieselskabet Jeanette Skinner v. Munson S.S. Line*, 20 F.2d 345 (2d Cir.1927). Accordingly, on most time charters, the shipowner pays the crew's wages and supplies their food, pays for engine room stores, keeps the vessel repaired and pays for insurance, and "almost everything else falls upon the charterer." Poor on Charter Parties and Ocean Bill of Lading, 1968 Ed., § 7.

The MSC Agreement defines itself as an "ocean carriage contract." MSC Agreement § C–4. The purpose of the Agreement is to "establish the contractual terms pursuant to which the carrier agrees to accomplish ocean transportation of such lawful cargo ... as may be tendered from time to time by the Government for carriage under this Agreement." MSC Agreement § C–7. The Agreement defines the Vessel as an "ocean common carrier" or "contract carrier," defined as:

any person which engages in vessel operating ocean transportation of passengers or cargo in the foreign commerce of the United States for compensation under a continuing contract with the Government for a specified period of time for the furnishing of such ocean transportation services through the dedication of space in its vessels, and for which the carrier assumes responsibility for that transportation from the port or point of receipt to the port or point of destination.

MSC Agreement § C–4. On the other hand, the Government's role under the MSC Agreement is not defined in the Agreement's extensive glossary or elsewhere.[5] In many respects, however, the Government's role is strikingly similar to that of a charterer.

i. *Similarities between Agreement and NYPEA Charter*

The MSC Agreement defines the general terms under which the Government hires the Vessel under discrete contracts, called shipping orders, for specified destinations. *See* § C–6(c)(2). Like a charterer, the Government under the MSC Agreement pays a fee to the Shipowner to reserve or "dedicate" cargo space for a certain period of time. *See* § C–4. Like a charterer, the Government may determine the Ship's routes and destination by booking Shipping Orders for certain voyage routes and by requiring the Vessel, once the voyage has begun, to shift to any particular dock or wharf within a given port of call. *See* § C–8(a).

As in a charter, where the shipowner pays "ordinary running expenses," the MSC Agreement provides that the Shipowners pay routine costs. For instance, the Shipowners agree to clean vessel holds after the discharge of cargo, *id.*; to supply fully operable ship gear for the Government's use, and provide sufficient power to

---

5. Curiously, the term "Charterer" is defined in the glossary of the Agreement. *See* MSC Agreement § C–4 ("charterer [is] one who leases a ship or part of its cargo space ... for a voyage, a single or round trip, or a stated period.").

operate the gear, § C–8(g); to pay crew wages, § C–8(c); and to pay "all expenses" associated with providing "acceptable space" for the cargo, *id.* Similarly, the Government, like a charterer, covers expenses "specifically incidental to the trade" for which the ship is employed, such as "extra cargo fittings or material required for a special trade," *see* § C–8(e); "unusual deck cargo," *id.;* and overtime differential costs that have been approved in writing by a Government employee on the scene, *id.*

Finally, the Government, like a charterer under the NYPEA Time Charter, agrees to cover "all expenses of loading, stowing and discharging the cargo." § C–8.

### ii. *Differences between NYPEA Charter and Agreement*

Under a typical charter, there is a third-party shipper of cargo for whom the shipowner and the charterer provide services. Both the charterer and the shipowner receive remuneration for their respective services. The commercial objective of a charter relationship is "to divide the duties for navigation and seaworthiness of the ship and for the handling of cargo among the owner and charterer, with the expectation that both will benefit from the vessel's earnings." *Marcial Ucin S.A. v. S.S. Galicia,* 723 F.2d 994, 998 (1st Cir.1983). As explained in *The Santona,* in a time charter context,

> the ship is the owner's ship, and the master and crew his servants for all details of navigation and care of the vessel; but for all matters relating to the receipt and delivery of cargo, and to those earnings of the vessel which flow into the pockets of the charterers, the master and crew are the servants of the charterers.

*Clyde Commercial S.S., Ltd. v. United States Shipping Co. (The Santona),* 152 F. 516, 518 (S.D.N.Y.1907). Because of this division of responsibilities between the shipowner and charterer, the ship's crew, although employees of the shipowner, may be acting as agents of the charterer if the work they are undertaking falls within the ambit of the charterer's responsibilities. *Yeramex,* 595 F.2d at 946–47; *Hayes v. Wilhelmsen Enterprises, Ltd.,* 818 F.2d 1557, 1561 (11th Cir.1987).

The Government cites a clause from the NYPEA Time Charter that expresses the agency relationship that may arise between the ship's crew and the charterer. The clause, which is found in Clause 8 immediately preceding the phrase "Charterers are to perform all cargo handling at their expense," is absent from the MSC Agreement. It reads as follows:

> "The Captain (although appointed by the owners) shall be under the orders and directions of the Charterers as regard employment and agency . . ."

Exh. K, Gribbin Aff. The Government argues that this language expresses a feature unique to charterers—namely, their "greater operational control over a vessel and its crew" as compared to a mere shipper of cargo who contracts with a shipowner for the carriage of his goods. The Government claims that it is a charterer's considerable authority over a vessel, absent in this case, that explains the Second Circuits's willingness to construe clause 8 to entitle a Shipowner to indemnification for personal injuries occasioned during cargo operations. The Court disagrees.

First, the Court is not convinced that a charterer exercises any greater operational control over a ship than does the Government under the MSC Agreement. Although the MSC Agreement lacks the self-contained "agency" clause that is found in the comparatively succinct NYPEA Charter, the Court notes that throughout the MSC Agreement are numerous provisions demonstrating the significant degree of operational control exercised over the Vessel by the Government.

When the Government's cargo is of a certain minimum tonnage, the Government can "require that the vessel call at any

particular dock," § C–8(a); even when this minimum requirement is not met, the Government "may nevertheless require that the vessel shift" to a particular dock, with the direct costs to be reimbursed by the Government. *Id.* The Agreement provides that the Government may "require the carrier's employees ... to rig the vessel's heavy lift gear," § C–8(g); that the "Vessel shall work night and day if required by the Government"; and that the Government may "order" workers to work overtime. Only when the Government gives its written approval for overtime will it pay for these cost. *Id.* Finally, the "cargo shall be loaded stowed, trimmed and secured by the Government," § C–8(k), and the Government "shall bear all expenses" related to such activities. § C–8(e).

Each of these provisions entitles Government personnel to direct the Ship's crew to perform activity for the Government's benefit at the Government's choosing. The provisions express the Government's apparently considerable concern over "matters relating to the receipt and delivery of cargo"—matters which are the hallmark of a charterer under a charter relationship. *See, e.g., The Santona,* 152 F. at 518.

Furthermore, the fact that the Government functions as both the shipper and cargo owner does not prevent the Government from acting as a de facto charterer. Indeed, a number of recent cases demonstrate that the Military Sealift Command regularly enters into express charter contracts with private, foreign shipowners and acts as the charterer in the transport of government-owned cargo under these contracts. *See A/S Dampskibssetskabet Torm v. United States of America,* 1999 WL 706129 (Sept. 9, 1999) (MSC enters into "MSC's standard charter party" with Danish Shipowner and acts as charterer, transporting 240,000 barrels of government-owned jet fuel from Kuwait to Japan); *Misano di Navigazione v. United States,* 968 F.2d 273 (2d Cir.1992) (using "standard charter contract form drafted and used by the Government," MSC charters vessel owned by Italian carrier to transport fuel oil from Scotland to Guantanamo Bay, Cuba). The Government does not explain how its role under the MSC Agreement in any way differs from such charter contracts. The only difference apparent to the Court is that the MSC Agreement nowhere explicitly defines the role of the Government, either as "charterer" or otherwise (although, as noted, the Glossary of the Agreement curiously provides a definition of "charterer").

Finally, and perhaps most significantly, the *Fernandez* court did not discuss the relationship between the parties as owner and charterer. In finding that Clause 8 required the charterer to indemnify the shipowner for a longshoreman's personal injuries, the court relied instead on the explicit language of the agreement entered into between them. The language in Section C–8 of the MSC Agreement is identical in all material respects to Clause 8.

In summary, the Court finds no basis from which to conclude that the charter relationship in *Fernandez* is materially distinguishable from the instant "ocean carriage contract" such that identical clauses in both contracts should be differently construed.

b. *Fernandez under the present LHWCA statutory scheme*

The Government asserts that the *Fernandez* holding of indemnity for personal injuries is not controlling under the LHWCA's present statutory scheme. The Government points out that the *Fernandez* shipowner was not indemnified after being found negligent, but rather was indemnified after being found liable on the no-fault theory of unseaworthiness. The Government argues that the *Fernandez* holding of indemnity for personal injuries cannot be mechanically applied in this case because the Shipowners are being sued under a theory of liability not confronted by the *Fernandez* court.

The Government ignores the findings of a number of courts that have applied *Fernandez* indemnity to the negligence setting. Since the abolition of a longshoreman's right of action against a shipowner for unseaworthiness, courts in this and two other circuits cite *Fernandez* for the proposition that a shipowner is entitled to contractual indemnity under Clause 8 in *negligence* actions brought against it for "cargo-related" personal injuries. *See Camiolo v. Felicitas–Rickmers Line K.G. & Co.*, 449 F.Supp. 18 (S.D.N.Y.1978); *Hayes v. Wilhelmsen Enter. Ltd.*, 818 F.2d 1557 (11th Cir.1987); *Turner v. Japan Lines, Ltd.*, 651 F.2d 1300 (9th Cir.1981) (all three cases confronting a time charter containing a Clause 8 identical to the Clause 8 in *Fernandez* ).

While these courts do not fully explain the rationale for extending *Fernandez* indemnity to the negligence context, there is a reasoned basis for such an extension. First, the Second Circuit in *Fernandez* did not limit its holding to circumstances in which a shipowner is found liable under a theory of unseaworthiness. The absence of such limiting language is significant. The court expressly noted in its decision that a shipowner could be found liable under a theory of negligence *or* unseaworthiness under pre–1972 law. That the court did not thereafter specify that its holding applied only to cases brought under a theory of unseaworthiness strongly suggests that no such limitation was intended.

Indeed, although the *Fernandez* court was applying pre–1972 amendment law, the court acknowledged that the change in the law had eliminated an unseaworthiness cause of action. It can be assumed that the court recognized that its decision, issued in 1976, could only be useful as precedent in cases in which a shipowner was being sued under a theory of negligence. Absent an indication from the court that it meant its holding to apply only in cases asserting a theory of liability that no longer existed, this Court sees no basis for adopting such an interpretation.

### c. *The scope of the § C–8 indemnity provision*

Those courts that have extended *Fernandez* to negligence actions have not precisely defined the scope of the Clause 8 indemnity provision. The Shipowners in the instant case suggest that § C–8 entitles them to indemnification for any negligence as long as the longshoreman's injury occurred during stevedoring, checking and cargo operations. The Court believes that such a construction is overly broad and unwise.

*Camiolo*, *Hayes* and *Turner* certainly support the proposition that it is a prerequisite to indemnity that the injury occur during cargo operations. In *Camiolo* and *Hayes*, the charterers were ultimately found not liable for the longshoremen's personal injuries, but only because the courts concluded that the injuries were not related to the "discharge of cargo" and therefore fell outside the scope of the Clause 8 indemnity provision. Specifically, the *Hayes* court found that maintenance of a vessel's cargo doors was not "related to the discharge of cargo" and that it fell within the traditional domain of shipowner. *Hayes*, 818 F.2d at 1559. Similarly, the *Camiolo* court found that the longshoreman's injury on an icy deck was "not 'cargo related' in the manner of Fernandez" because the plaintiff was not injured while actually loading or unloading cargo. *Camiolo*, 449 F.Supp. at 20. The court stated that an icy deck not being used for cargo loading is a condition "traditionally within the ambit of a shipowner's duty." *Id.*

In *Turner*, the Ninth Circuit granted the Shipowner's motion for indemnity. The *Turner* longshoreman who was unloading plywood was injured when a stack of plywood in the hold beneath him collapsed. The court found that the longshoreman's injury "was caused by the improper loading of the cargo" and therefore fell within the scope of Clause 8. *Id.* at 306.

Stating that "we agree with the decision of the Second Circuit [in *Fernandez* ]," the Court held that "the Time Charterer must indemnify the Owner for any damages paid to plaintiff," the longshoreman. *Id.*

However, the Sixth Circuit has suggested that while a finding that the injury occurred during cargo operations is necessary to trigger indemnity, it is not sufficient. In *Migut v. Hyman–Michaels Co.*, 571 F.2d 352 (6th Cir.1978), a longshoreman was killed during the loading of a vessel when he fell through an open hatch. *Id.* at 353. The court declined to decide whether Clause 8 constituted an indemnity provision protecting the shipowner. *Id.* The court reasoned that the death "resulted from acts or omissions of the captain that were not connected to the cargo handling," but rather were connected to his negligent turning over of a ship that was not structurally fit for cargo operations. *Id.* at 354–55.

From the foregoing cases emerges a narrower, more sensible construction of § C–8 than is advocated by the Shipowners. For a shipowner to be entitled to indemnification under Section C–8, not only must the injury have taken place during the process of "loading, stowing and discharging of cargo, such as ... stevedoring [and] checking"; in addition, the shipowner's negligent acts or omissions must also have occurred during, and in relation to, the cargo loading process. Put another way, the shipowner has a right to indemnification under § C–8 only to the extent that it is found liable for the breach of its limited *Scindia* duty to intervene during cargo operations.

Requiring the Government to indemnify the Shipowners for acts or omissions that occurred during a time when neither the Government nor the Stevedore was supervising cargo operations runs afoul of the principle that a contract should not be interpreted to reward a party who is solely negligent. *Seckinger*, 397 U.S. at 212, 90 S.Ct. 880. When cargo operations are not taking place, a vessel is under the control of the shipowner, who has a duty to maintain the safety of areas under its active control and to "turn over" a safe vessel to the Stevedore once cargo operations commence. *See Howlett*, 512 U.S. at 98, 114 S.Ct. 2057. The shipowner's negligence in performing these duties before cargo operations have begun may nevertheless cause a longshoreman's injury once cargo operations are underway. The Court declines to hold the Government responsible for the negligence of a party over which it exercises no control.

In contrast, this Court's construction of § C–8 as indemnifying the Shipowners only for their negligent acts or omissions that occurred during and in relation to the cargo loading process ensures that a party who is "solely or principally responsible for the damages" is not indemnified by a faultless party. *Seckinger*, 397 U.S. at 212, 90 S.Ct. 880. Once loading and unloading activities have begun, the Stevedore, not the Shipowners, have "primary control" of the operations. *Scindia*, 451 U.S. at 170, 101 S.Ct. 1614. While the Shipowners can be found secondarily liable for their negligence during such activities, the *sine qua non* of their liability is, in the first instance, a breach by the Stevedore of its duty of care. *Lieggi*, 667 F.2d at 328; *Moore*, 704 F.2d at 42. Thus the Government is required to indemnify the Shipowners only when it or its agent, the Stevedore, has been negligent.

Indeed, under the Government's contractual arrangement with the Stevedore, the Stevedore is required to indemnify the Government for injuries caused by the Stevedore's negligence. Exh. D, Gribbin Aff. The Government is therefore in a position to control its liability to the Shipowners under § C–8 by both prevention (monitoring the stevedoring activities during cargo operations) and indemnification (seeking payment from the stevedore once an injury has occurred).

*CONCLUSION*

Plaintiff raises genuine issues as to whether the Shipowners adequately exer-

cised their *Scindia* duty to intervene during cargo operations. The Shipowners' motion for summary judgment on plaintiff's negligence claim is therefore denied. In addition, the Court holds that the Government is required to indemnify the Shipowners for any of the Shipowners' negligent acts or omissions occurring during and in relation to cargo operations that resulted in plaintiff's injury.

SO ORDERED.